**IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

|  |  |  |
|---|---|---|
| VALORY SHEPPERSON, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. CPU4-14-003863 |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendant. | ) ) | |

Gary S. Nitsche, Esquire
Weik, Nitsche, Dougherty & Galbraith
305 North Union Street, Second Floor
P.O. Box 2324
Wilmington, Delaware, 19899
*Attorney for Plaintiff*

Patrick G. Rock, Esquire
Heckler & Frabizzio
800 Delaware Avenue, Suite 200
P.O. Box 128
Wilmington, Delaware, 19899
*Attorney for Defendant*

## DECISION AFTER TRIAL

This is a personal injury protection ("PIP") action arising out of a motor vehicle accident. Valory Shepperson ("Plaintiff") seeks damages totaling $5,679.81, stemming from medical expenses allegedly incurred as a result of a motor vehicle accident on November 12, 2012 ("Accident"). Plaintiff claims that pursuant to Title 21 of the Delaware Code Section 2118 ("Section 2118"), as her insurer, State Farm Automobile Insurance Company ("Defendant") is obligated to pay the medical expenses. Trial took place on January 26, 2016, and the Court reserved decision. This is the Court's decision after trial.

# PROCEDURAL HISTORY

On December 30, 2014, Plaintiff filed a Complaint against Defendant alleging breach of contract for Defendant's failure to pay PIP benefits pursuant to an insurance agreement between the parties. Plaintiff alleges that Defendant insured her for no-fault benefits pursuant to Section 2118. Plaintiff contends that she suffered neck and back injuries from the Accident, and the medical expenses that she sustained were reasonable, necessary, and causally related to the Accident. Plaintiff seeks damages totaling $5,679.81 plus ongoing medical expenses, attorneys' fees, and court costs.[1]

On February 12, 2015, Defendant filed its Answer denying Plaintiff's substantive allegations, but admitted to the existence of the no-fault insurance agreement. Defendant denies that Plaintiff's medical expenses were reasonable, necessary, and causally related to the Accident. In its Answer, Defendant asserted numerous affirmative defenses, of which defenses Defendant pursued only two at trial: that Plaintiff's medical expenses were not reasonable, necessary, or causally related to the Accident; and that Defendant had already paid some of the claimed medical expenses.[2]

On January 26, 2016, the Court held trial. At trial, Plaintiff was the only witness to testify, however both parties proffered medical expert reports and medical records for the Court's consideration.[3]

---

[1] Plaintiff's damages claim is divided as follows: $310.00 for Dr. Leitzke's services, $1,079.00 for Dr. Tucker's services, $1,550.00 for Dr. Cary's services, and $2,740.00 for Aegis Sciences Corporation-administered drug screens. Pursuant to 21 *Del. C.* § 2118B, Plaintiff requests attorneys' fees. However, Plaintiff abandoned its claim for these fees, when at trial it failed to allege Defendant acted in bad faith.

[2] Before trial the parties stipulated that two bills for services provided by Dr. Leitzke, both dated January 16, 2015, and in amounts of $215.00 and $95.00, have already been paid and should not be included in the damages calculation. Therefore, the Court will deduct $310.00 from any damages attributable to Dr. Leitzke.

[3] Plaintiff offered Dr. Cary's narrative report and Defendant offered narrative reports by Dr. Gelman and Dr. Murphy. The parties' exhibits are voluminous and at times cumulative; therefore, the Court has distilled these exhibits to their salient facts and presents them in summary.

## FACTS

Plaintiff testified that at approximately 4:00 p.m. on November 12, 2012, she was rearended while in her car at a stop light. Plaintiff stated that at the moment of impact she felt immediate pain and was in shock. At approximately 5:10 p.m., Plaintiff drove herself to Christiana Care's emergency room where hospital staff conducted Plaintiff's intake, provided her treatment, and subsequently discharged her, albeit against the hospital staff's recommendation. Plaintiff stated that after the Accident, in order to continue working, she sought regular treatment and pain management from various healthcare professionals. Plaintiff also indicated that before the Accident, she worked overtime on a regular basis, but that due to her injuries she is no longer able to work such hours.

Subsequent to her emergency room visit Plaintiff received treatment from multiple health care professionals beginning on November 13, 2012 and continuing through December of 2015. This treatment consisted of visits with Doctor Wayne Tucker ("Dr. Tucker"), her primary care physician; Doctor Andrew Leitzke ("Dr. Leitzke"), for chiropractic therapy; Doctor Wai Wor Phoon ("Dr. Phoon"), who performed an electromyographic exam ("EMG") to rule out radiculopathy; Doctor Damon Cary ("Dr. Cary"), a pain management specialist; and Limestone Therapeutic Massage ("Limestone"). In addition, Plaintiff underwent various diagnostics examinations, including two magnetic resonance imaging ("MRI") examinations of her spine, one EMG, and seven drug screens.

Plaintiff testified that at the hospital she complained of neck, shoulder, and back pain. Emergency room records ("ER Records") indicate that Plaintiff reported moderate pain beginning at the moment of the impact. Specifically, Plaintiff reported neck, chest, back, and left

3

hand pain.[4] The "Clinical Impression" section of the ER Records indicates doctors diagnosed Plaintiff with a strain to the cervical and lumbosacral regions of the back. Ultimately, emergency room staff provided Plaintiff a prescription for Percocet and instructed her to follow up with Dr. Tucker.

On November 13, 2012, the day after the Accident, Plaintiff visited Dr. Tucker complaining of neck, shoulder, and back pain. Dr. Tucker soon diagnosed Plaintiff with sprains of the lumbar spine and neck, paravertebral spasms, and possible radiculopathy. Dr. Tucker instructed Plaintiff to see Dr. Leitzke three times a week for chiropractic therapy. At the end of December 2012, when Plaintiff began complaining of numbness in her left toes and fingertips, Dr. Tucker ordered an EMG to rule out radiculopathy. On December 28, 2012, Dr. Phoon administered an EMG that revealed mild radiculopathy at L5 radiating to the left lower extremities; however, the EMG was normal with respect to Plaintiff's upper extremities. Plaintiff's pain continued throughout the duration of her treatment but the numbness was intermittent. Dr. Tucker restricted Plaintiff to forty hours of work per week, prescribed Percocet for Plaintiff's pain, and eventually referred Plaintiff to Dr. Cary for pain management.

Plaintiff first visited Dr. Leitzke in November of 2012 and continued her visits until May of 2013. During this period, Plaintiff saw Dr. Leitzke approximately thirty-nine times. Plaintiff complained of moderate to severe pain in her neck and mid to lower back. Plaintiff also reported numbness in her left upper and lower extremities. Dr. Leitzke ordered two MRIs of Plaintiff's back, the results of which Dr. Leitzke noted, revealed at L4 – 5, a bulging disc hitting the dural

---

[4] In the "Past HX" section of the ER Records Plaintiff indicated that she had a past history of migraine headaches, but did not report any prior instances of back or neck injuries.

4

sac, and at C5 – 6 a disc herniation. Dr. Leitzke's general assessment was that Plaintiff had strains and sprains of the cervical, thoracic, and lumbar spine.[5]

Bear MRI performed Plaintiff's MRI exams. The first MRI revealed a bulging disc at L4 – 5,[6] and the second indicated malalignment, and a C5 – 6 disc protrusion impressing upon the thecal sac.[7] In addition to what the MRIs revealed, Dr. Leitzke's treatment and examinations indicated cervical and thoracic tenderness along with bilateral lumbar and cervical paraspinal spasms.

On June 17, 2013, Plaintiff first visited Dr. Cary for pain management. At the outset, Plaintiff reported experiencing pain of a constant and sharp nature that worsened during inclement weather. Plaintiff complained of pain at rest and after prolonged sitting or standing. Again, Plaintiff reported neck and back pain, in addition to occasional numbness and tingling in her left upper and lower extremities. Ultimately, Dr. Cary increased her Percocet dosage, recommended that she discontinue chiropractic treatment, and continue massage therapy.[8] Throughout treatment, Dr. Cary ordered seven random drug screens, all of which yielded a result positive for only Plaintiff's prescribed medications.[9]

Based on Plaintiff's treatment history and his examinations, Dr. Cary diagnosed her with chronic myofascial syndrome, cervical spine strain and sprain with C5 – 6 protrusion, lumbar spine strain and sprain with a bulging disc at L4 – 5, and L5 radiculopathy.[10] According Dr.

---

[5] Pl. Exhibit 3, 11/15/13 visit.
[6] Pl. Exhibit 4.
[7] Pl. Exhibit 5.
[8] Pl. Exhibit 7, 6/17/13 visit.
[9] Pl. Exhibit 7.
[10] Pl. Exhibit 7, 9/18/14 visit; Dr. Cary's notes are unclear with respect to the radiculopathy since at times the notes refer to it as "L4" and "L5" radiculopathy. However, the Court notes that all other references to radiculopathy on the record, importantly the Cary Report, refer to it as occurring at the L5 region. Therefore, the Court concludes that Plaintiff's doctors suspected her radiculopathy existed at the L5 region.

Cary's follow-up evaluation of December 14, 2015, Plaintiff still reported steady, moderate to severe, neck and back pain of the throbbing and stabbing variety.[11]

At trial, Plaintiff introduced Dr. Cary's Narrative Reports ("Cary Report") dated November 20, 2013 and November 18, 2015, in support of Plaintiff's claims against Defendant. Defendant introduced Doctor Andrew Gelman's ("Dr. Gelman") and Doctor William Murphy's ("Dr. Murphy") Narrative Reports (individually "Gelman Report" and "Murphy Report") (collectively "Defense Expert Reports").[12]

## PARTIES' CONTENTIONS

Plaintiff contends that Defendant breached the parties' insurance agreement by failing to pay for Plaintiff's medical expenses. In support of this contention, Plaintiff relies upon the Cary Report in which report Dr. Cary opines that, with a reasonable degree of medical probability, Plaintiff's injuries are causally and directly related to the Accident, and that all treatment provided to Plaintiff has been reasonable, necessary, and causally related to the injuries sustained during the Accident. The Cary Report found that Plaintiff suffered spine strain and sprain of the cervical, thoracic, and lumbar regions; the cervical and lumbar injuries being compounded by C5 – 6 disc protrusion and L4 – 5 bulging disc, respectively. Dr. Cary reported that Plaintiff's injuries, and resultant pain, are permanent with respect to the cervical and lumbar regions of the spine. The Cary Report concluded that Plaintiff will likely not enjoy the same active lifestyle as she did before the Accident, and will more likely than not experience pain at rest, have difficulty with prolonged sitting and standing, and various other daily activities.

---

[11] Pl. Exhibit 7, 12/14/15.

[12] The Cary and Gelman Reports were introduced without objection, however Plaintiff objected to the Murphy Report on the basis that Defendant is using it to switch its basis for denying Plaintiff's claims. This Court finds the Murphy Report admissible since it offers evidence supporting but not altering Defendant's original basis for denying Plaintiff's claims. *Re: Lisa Kanick v. State Farm Mut. Auto. Ins. Co.*, 2007 WL 1378334, at *2 (Del. Super. May. 7, 2007) (holding an insurer may introduce additional facts in support of initial disclaimer so long as facts do not advance a new ground for coverage denial).

Defendant contends that it properly denied Plaintiff's claim for medical expenses and thus, it is not in breach of contract. Defendant avers that Plaintiff's expenses were not reasonable, necessary, and causally related to the Accident because they originated from a pre-existing degenerative condition, and that any damage caused by the Accident would have stabilized in the subsequent six to twelve weeks. In support of this contention, Defendant relies upon the Gelman and Murphy Reports.

In the Gelman Report, Dr. Gelman concluded that Plaintiff reached maximum medical improvement as of February 2013, and that Plaintiff's examination was normal. Dr. Gelman also noted "a very slight decreased disc signal" and that the "cervical and lumbar spine findings noted are degenerative . . . [and] pre-date" the Accident.[13] Dr. Gelman based his conclusions on a physical examination of Plaintiff conducted on September 17, 2013, a review of Plaintiff's medical and musculoskeletal history, the MRI reports, and Dr. Phoon's EMG report. Dr. Gelman believes that the MRI exams were not required because the records do not reflect or document any significant neurological finding and Plaintiff's medical history does not identify anything of a "red flag" nature.[14] Dr. Gelman also determined that the EMG findings of radiculopathy "cannot be supported via clinical objective assessment." According to Dr. Gelman, Plaintiff's symptoms could have been reasonably treated with "a few months of conservative care," and that although reasonable early on, as of May 2013, Dr. Leitzke's care has been "excessive."[15]

On December 3, 2014, Dr. Murphy examined Plaintiff and concluded that Plaintiff was fully recovered from any Accident-related injuries. He opined that further treatment was not reasonable or medically necessary. In his report, Dr. Murphy mentioned that Plaintiff had

---

[13] Def. Exhibit 1 p. 2.
[14] *Id.* at 3.
[15] *Id.*

subjective complaints of pain but that upon physical examination, these complaints were not "substantiated with any objective abnormalities."[16] Dr. Murphy opined that any soft tissue injuries would have stabilized in a period of six to twelve weeks post-injury. Dr. Murphy also noted that, in relation to the Accident, no MRI testing, EMG testing or massage therapy would be considered reasonable or medically necessary. Moreover, Dr. Murphy suggested that any further opiate medication prescriptions would not be considered reasonable or medically necessary. Dr. Murphy concluded that Plaintiff suffered no physical restrictions or permanent injuries resulting from the Accident.

## DISCUSSION

Section 2118 requires insurance carriers to compensate its insured for "reasonable and necessary" medical expenses that relate to a motor vehicle accident for which the insured's PIP policy covers.[17] "The statutory standard is reasonable and necessary, which includes reasonable medical probability."[18] In order to satisfy this statutory standard, a plaintiff must present medical expert testimony that establishes "a causal link between the accident and the insured's injuries."[19] Thus, a plaintiff seeking reimbursement from an insurance carrier under the PIP statute "bears the burden of proof to establish by a preponderance of the evidence that the medical services received were necessary and that the bills or charges for such services were reasonable."[20] Section 2118(2)(a) limits compensation to those expenses incurred within two years from the date of the accident.[21]

---

[16] Def. Exhibit 7 p. 4.

[17] *State Farm Mut. Auto. Ins. Co. v. State Dep't of Natural Res. & Envtl. Control*, 2011 WL 2178676, at *2 (Del. Super. May 31, 2011).

[18] *Id.*(quoting *Dennis v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 4409436, at *2 (Del. Super. Feb. 13, 2008)).

[19] *Id.* (citing *Rayfield v. Power*, 840 A.2d 642 (Del. 2003) (TABLE)).

[20] *Mangene v. State Farm Ins.*, 2015 WL 4603052, at *3 (Del. Com. Pl. May 28, 2015) (quoting *Watson v. Metropolitan Property and Cas. Ins. Co.*, 2003 WL 22290906, at *5 (Del. Super. Ct. Oct. 2, 2003

In determining whether the plaintiff has met this burden, the Court, which serves as the trier of fact in a non-jury trial, has the sole responsibility in determining the credibility of witnesses.[22] When evidence is in conflict, the Court must resolve those conflicts "if reasonably possible[,] so as to make one harmonious story."[23]

Plaintiff has demonstrated, by a preponderance of the evidence, that the medical services received were necessary and that the bills or charges for such services were reasonable. The Court finds Plaintiff's testimony credible because her subjective observations and complaints are in accord with objective medical examinations.

At the outset, Plaintiff complained to emergency room staff of neck and back pain which she described as beginning at the moment of impact. During her subsequent encounters with Dr. Tucker, Dr. Leitzke, Dr. Cary, Dr. Gelman, and Dr. Murphy, Plaintiff consistently reported having identical medical issues and significant pain. Notably, Plaintiff testified that prior to the Accident, she had not experienced neck or back pain of this type, and according to Defendant's expert, the X-rays of Plaintiff's back and neck, taken proximate to but before the accident, were normal.[24] By all accounts, the MRIs indicated the presence of abnormalities in the form of a bulging disc and disc protrusion, the cause of which remains in dispute, but whose symptoms are known to cause pain.

Defendant's argument that a pre-existing degenerative condition is the actual cause of Plaintiff's pain is unavailing. Defendant contends that Plaintiff's complaints, lingering beyond February of 2013, arose from a degenerative condition in the cervical and lumbar spine which

---

(citing 17 Lee R. Russ & Thomas F. Segalla, Couch On Insurance § 254:59 (3d ed. 2001)) (internal brackets omitted).

[21] 21 *Del. C.* § 2118(2)(a).

[22] *Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr. et. al.*, 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000).

[23] *Id.*

[24] Def. Exhibit 7 p. 3.

pre-dates the Accident. In support of this, Dr. Gelman directs the Court to a "very slight decreased disc signal" in the L4 – 5 disc, yet he fails to offer any reasoning to support his conclusion. In contrast, the Cary Report supports a narrative that the pain began as a result of the Accident and continued beyond the moment of soft tissue recovery, which corroborates the independent observations of other healthcare professionals, and buttresses Plaintiff's testimony. Dr. Cary reports that within a reasonable degree of medical probability, and as a result of the Accident, Plaintiff sustained a cervical, thoracic, and lumbar spine strain and sprain, compounded by C5 – 6 disc protrusion, L4 – 5 bulging disc, and L5 radiculopathy. Although Defendant provides a viable alternative basis upon which to explain Plaintiff's injuries, such explanation, and the evidence provided in its support, falters in light of Plaintiff's presentation of substantively rich documentary and testimonial evidence. Simply put, Plaintiff's evidence strongly comports with, and builds upon the facts on record, but Defendant's Expert Reports make largely unsubstantiated claims which are comparatively speculative.

Defendant further argues that damages associated with the seven drug screens requested by Dr. Cary are unreasonable. In support of this, Defendant submitted a worker's compensation fee schedule for laboratory services.[25] According to this document, a maximum lab fee of $100.00 is permissible. To justify her medical expenses, Plaintiff provided the Cary Report, which stated that all medical expenses were reasonable. It is this Court's inclination, in a non-worker's compensation case, to follow the fact-specific conclusions of a qualified and experienced medical expert over a worker's compensation fee schedule of questionable applicability. Therefore, the Court finds that all of Plaintiff's incurred medical expenses were reasonable.

---

[25] Def. Exhibit 5.

## CONCLUSION

For the reasons discussed herein, the Court finds for Plaintiff in the amount of $5,369.81, plus court costs. The Court will not award attorneys' fees as there is no evidence that Defendant made a bad faith denial of Plaintiff's claim.

**IT IS SO ORDERED** this 28th day of March, 2016.

Sheldon K. Rennie,
Judge